UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

HUA LIN,

                    Plaintiff,

        -against-                                    1:14-CV-0771 (LEK/DJS)

NEW YORK STATE DEPARTMENT OF
LABOR,

                    Defendant.

_____

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

Plaintiff Hua Lin commenced the present action against Defendant New York State

Department of Labor ("DOL"), alleging unlawful retaliation in violation of Title VII, 42 U.S.C. §

2000e *et seq.*, and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290

*et seq.* Dkt. No. 1 ("Complaint"). Presently before the Court are Lin's Motion for Summary

Judgment and DOL's Cross-Motion for Summary Judgment. Dkt. Nos. 39 ("Lin Motion"), 45

("DOL Motion"); see also Dkt. Nos. 39-23 ("Lin Memorandum"), 39-24 ("Lin Statement of

Material Facts"), 45-3 ("DOL Memorandum"), 45-1 ("DOL Statement of Material Facts"), 46

("Lin Response"), 50 ("DOL Reply"). For the reasons that follow, DOL's motion is granted and

Lin's motion is denied.

## II.    BACKGROUND

Lin began working for DOL on August 7, 2008. Lin SMF ¶ 1. She worked as a

probationary Senior Employment Security Clerk ("SESC") at the Troy Telephone Call Center

("Troy TCC"), DOL SMF ¶ 1, and her job entailed "the intake and processing of initial claims

for unemployment insurance, . . . and answering questions asked by unemployment insurance claimants who call in to the Troy TCC," id. ¶ 36. It is not disputed that SESC is an entry-level position. Id.; Dkt. No. 48 ("Lin Response to DOL Statement of Material Facts") ¶ 36. In September 2010, Lin was fired. DOL SMF ¶ 2. Without citing any evidence in the record, Lin maintains that her termination "was not due to poor performance, but because of unlawful discrimination." Lin Resp. to DOL SMF ¶ 2. DOL, for its part, asserts that Lin was fired because of poor performance. DOL SMF ¶ 2. In particular, Lin "consistently made an unacceptable amount of significant errors, provided poor customer service, was frequently away from her work station, was not focused on her job, and repeatedly failed to follow written policies and procedures." Id.

Shortly after she was fired in September 2010, Lin filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC"). Dkt. No. 39-18 ("Exhibit Q") at 2. After receiving a right-to-sue letter from the EEOC, id., Lin brought suit against DOL and her former supervisor on October 4, 2011, "alleging that she had been discriminated against due to her race, national origin and ethnicity, subjected to a hostile work environment, and retaliated against for engaging in protected activity," Lin SMF ¶ 3. On October 23, 2013, Judge Gary L. Sharpe granted DOL's motion for summary judgment, holding that Lin's poor performance as an SESC provided a nondiscriminatory rationale for DOL's decision to fire her, that Lin could not show that that rationale is a pretext for discrimination, that Lin could not establish that she experienced a hostile work environment, and that Lin failed to state a claim for retaliation. Lin v. N.Y. State Dep't of Labor, No. 11-CV-1186, 2013 WL 5755386, at *4–7 (N.D.N.Y. Oct. 23, 2013). With respect to the retaliation claim, Judge Sharpe found that Lin had not "clarified to her

employer that she was complaining of unfair treatment due to her membership in a protected class" before she was terminated. Id. at *7. He went on to say that even if Lin could state a prima facie case of retaliation, she had failed to put forth evidence suggesting that DOL's justification for terminating her is a pretext for retaliatory animus. Id.

While the litigation before Judge Sharpe was pending, Lin passed the New York Civil Service Exams for the following positions: Labor Services Representative ("LSR"), LSR (Chinese), Labor Standards Investigator ("LSI"), and LSI (Chinese). Lin SMF ¶ 5. Some background on the process by which civil servants in New York are hired is necessary to understand the events that followed. A person wishing to become a civil servant in New York has to take a Civil Service Exam for the position she desires. DOL SMF ¶ 6. If she passes, she gets put on the eligible list for that position by the New York State Department of Civil Service ("DCS"). Id. If, as was the case for the jobs sought by Lin, id. ¶ 28, the position she is seeking is title grade 18 or below, she is "automatically assigned by DCS to a geographic location according to [her] zip code," id. ¶ 8. If she wants to be considered for positions located outside her zip code, she must inform DCS of her geographic preferences. Id.

Typically, an agency in a given area that wants to hire someone for a position "must first identify a vacancy[,] and funding for the position must be approved." Id. ¶ 10. In DOL, after a vacancy is approved, DCS provides a "list of candidates eligible to be hired for that specific vacancy . . . with candidates ranked by test score." Id. ¶ 11. Assuming again that the position is title grade 18 or below, the eligible candidates are those whose area code places them in the area where the DOL branch is located and those who have indicated to DCS their preference for a position in that area. Id. ¶ 13. Eligible candidates may be considered for the position, but DOL

need not "canvass eligible candidates or . . . conduct interviews." Id. ¶ 14. DOL must hire

someone for the position from among the three eligible candidates with the highest scores on the

relevant exam. Id. ¶ 17. This is known as the "rule of three." Id. A candidate who is one of the

three highest scorers is deemed "reachable." Id. DOL may look beyond the three highest-scoring

eligible candidates if one or more of them take themselves out of consideration. Id.

After passing the exam, Lin became one of the eligible candidates for the LSR positions

in March 2011. Id. ¶ 29. But Lin did not become reachable for any position until April 2013,

when "an LSR (Chinese Language) position became available at the Troy TCC." Id. ¶¶ 32–33.

Edward Delehanty was "responsible for making final decisions with respect to the canvassing

and hiring of candidates for LSR at the Troy TCC." Id. ¶ 34. In April 2013, Delehanty decided

not to consider Lin for the position. Id. ¶ 35. DOL claims that Delehanty refused to consider Lin

solely because of her poor performance as an SESC, id., while Lin asserts that he was retaliating

against her for her decision, in 2011, to file an employment discrimination lawsuit against DOL,

Lin Resp. to DOL SMF ¶ 35. Both parties agree that whereas the SESC position is entry level,

the LSR position "entails more responsibility and requires a greater degree of knowledge." DOL

SMF ¶¶ 36–37; Lin Resp. to DOL SMF ¶¶ 36–37. Specifically, "while an SESC needs to know

the basics concerning unemployment laws in order to respond to questions from claimants, LSRs

actually adjudicate disputes concerning unemployment claims, and must therefore have a much

deeper base of knowledge and understanding of those laws." DOL SMF ¶ 38.

At some point after DOL decided not to canvass or interview Lin, it "instituted a hiring

freeze because of a reduction in federal funding." Id. ¶ 41. As a result of the hiring freeze,

nobody was hired for the LSR position in 2013 or 2014. Id. Lin disputes that there ever was a

hiring freeze, though she fails to point to any evidence to support this claim; and she emphasizes that the freeze began after DOL decided not to consider her for the opening. Lin Resp. to DOL SMF ¶ 41. Lin further asserts that DOL provisionally hired Poon-Man Tang for the LSR position in an effort to avoid having to take someone from the list of eligible candidates, and that he has been reappointed "year after year." Lin SMF ¶¶ 26–27. According to Lin, Tang was first appointed in 2011, id., but DOL asserts that he was originally hired in 2005, Dkt. No. 45-16 ("Delehanty Declaration") ¶ 12. Lin states that Tang failed the Civil Service Exam for the position several times. Lin SMF ¶ 27. In April 2013, DOL interviewed Longwan Xu for the LSR position even though his score on the Civil Service Exam was lower than Lin's. Id. ¶ 28. The interview went poorly, and the interviewers said Xu's English was not good enough for him to do the job. Id. ¶ 29; Dkt. No. 39-14 ("Exhibit M"). But Xu was interviewed once more for the same position in June 2013, and he was never hired. Id. ¶¶ 30–31; Dkt. No. 39-16 ("Exhibit O") at 1–2. Lin asserts that these actions reflect both the Troy TCC's policy of offering to interview every person on the list who spoke Chinese and its determination not to hire Lin. Id. ¶¶ 14, 25, 28. DOL disputes the existence of such a policy. Dkt. No. 45-2 ("DOL Response to Lin SMF") ¶ 14.

DOL's failure to consider Lin for the LSR position in Troy is not the only allegedly adverse employment action of which she complains. In November 2009, Lin was canvassed for an LSI (Chinese) position, and she stated that she was not interested in "receiv[ing] notifications of postings for that particular job in Endicott, New York." Lin SMF ¶ 35. But she was never canvassed for the LSR (Chinese) position in Endicott, presumably because she never "indicated . . . which geographical areas . . . she would prefer for that position." Id. ¶ 36. (Recall that for

positions with title grades 18 or lower, such as the LSR (Chinese) position, the applicant must inform DCS of her geographic preferences if she wants to be considered for positions outside her area code. DOL SMF ¶ 8.) Lin also says that "at some point," she was removed from the civil service list entirely despite never requesting removal. Lin SMF ¶ 38. DOL contends that this never happened. DOL Resp. to Lin SMF ¶ 38.

As noted above, Lin claims that Delehanty was motivated by a desire to retaliate against her for suing DOL when he decided not to consider her for the LSR position in April 2013. Lin Resp. to DOL SMF ¶ 35. In support of this argument, Lin relies heavily on a series of emails dating from May 2011. On May 18, 2011, Diane Taylor, the assistant director at the Troy TCC, sent an email to Lawrence Brodsky, the Troy TCC's director of personnel, Bianca Ramos, the head of the Troy TCC, and Delehanty. Lin SMF ¶ 8. The subject line of the email is "Hua Lin – Remove from LSR List?" Id. The email in its entirety reads:

> You probably know that one of our former employees, Hua Lin, filed a discrimination complaint against her former supervisor PESC Jackie Simmons. When the investigator was questioning us, at one point Hua told the investigator she had her production sheets. These production sheets contain SSNs and should not have been removed from the office. This is a breach of confidentiality. Can we use this to justify removing her from our LSR list?

Id. ¶ 9; Dkt. No. 39-6 ("Exhibit E") at 2. On May 24, 2011, Taylor followed up with Brodsky and Delehanty, and on the same day Brodsky sent her an email saying that he would call her about this. Lin SMF ¶¶ 10–11; Ex. E at 1. The next day, Taylor emailed Delehanty and Ramos, informing them that "Larry told me that we might be able to pursue this with Civil Service when we start hiring CL LSRs, and we need to get past Hua." Lin SMF ¶ 12; Ex. E at 1. Delehanty, the

person responsible for the decision not to hire Lin for the LSR position, DOL SMF ¶ 35, did not reply to any of these emails.

At some point before the Complaint in this case was filed, Lin filed another discrimination charge with the EEOC, alleging that DOL had retaliated against her for previously suing DOL by refusing to hire her for an LSR position. Ex. Q at 2. DOL's lawyer responded to the charge by arguing, among other things, that Lin was not hired for the position because she "did not receive a sufficiently high score on the civil service examination at issue to be eligible . . . in a geographic location that she selected." Id. at 4. DOL's lawyer also noted that it "in no way waive[d] its right to present new or additional information at a later date, for substance or clarification." Id. at 5. On June 24, 2014, Lin filed her Complaint, alleging that DOL retaliated against her in violation of both Title VII and the NYSHRL. Compl. at 3–4. On August 18, 2014, DOL moved to dismiss the Complaint. Dkt. No. 7 ("Motion to Dismiss"); see also Dkt. No. 7-1 ("Memorandum"). DOL suggested that Taylor's first March 2011 email merely "sought legitimate, nondiscriminatory reasons not to hire plaintiff," and that the later email, which said "we need to get past Hua," was best read to mean that "whatever past feelings existed about plaintiff, they needed to be put aside." Mem. at 4–5. The Court denied the Motion to Dismiss as to the Title VII claim but granted it as to the NYSHRL claim, since Lin had indicated her desire to withdraw the latter. Dkt. No. 12 ("December Order") at 11.

On August 26, 2016, Lin moved for summary judgment. Lin Mot. Lin argues that she has established a prima facie case of retaliation: she engaged in protected activity by suing DOL, DOL was aware of that activity, she suffered the adverse employment actions discussed above, and there is enough evidence to show a causal connection between the adverse employment

actions and the protected activity. Lin Mem. at 3–11. Further, she argues that the March 2011 emails, together with the shifting explanations given by DOL for not hiring her, demonstrate that any nonretaliatory explanation DOL might offer for its decision not to hire her is a pretext for retaliation. Id. at 11–15. DOL responded to Lin's motion and cross-moved for summary judgment, arguing that Lin's retaliation claim is collaterally estopped by Judge Sharpe's summary judgment ruling, and that in any event Lin cannot establish a prima facie case of retaliation. DOL Mem. at 12–20. DOL also claims that it had a legitimate, nonretaliatory reason for refusing to hire Lin, namely her poor performance as an SESC, a far less demanding position than LSR. Id. at 20–23.

### III. LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted.").

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party

carries the ultimate burden of proof and has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

In attempting to repel a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 742 (2d Cir. 1998). Thus, a court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV. DISCUSSION

### A. Title VII Retaliation

To state a prima facie case of retaliation under Title VII, a plaintiff must show that: (1) she was engaged in protected activity; (2) the employer was aware of that activity; (3) she was thereafter subjected to an adverse employment action; and (4) there was a causal connection between her protected activity and the adverse action. Patane v. Clark, 508 F.3d 106, 115 (2d Cir. 2007). A plaintiff carries "a minimal burden of proof at the prima facie stage." Pointdujour v. Mount Sinai Hosp., 121 F. App'x 895, 897 (2d Cir. 2005). Once a plaintiff establishes a prima facie case, "the burden shifts to the employer to articulate 'some legitimate, nondiscriminatory reason' for its action." Lundy v. Town of Brighton, 732 F. Supp. 2d 263, 271 (W.D.N.Y. 2010)

(quoting Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 106 (2d Cir. 2010)). "Finally, if the defendant carries his burden[,] 'the presumption of retaliation dissipates' and the plaintiff must demonstrate that the legitimate reason offered is mere pretext for retaliation." Sharpe v. Utica Mut. Ins. Co., 756 F. Supp. 2d 230, 238–39 (N.D.N.Y. 2010) (quoting Hicks v. Baines, 593 F.3d 159, 164–65 (2d Cir. 2010)). With respect to the prima facie case, the parties disagree only as to whether Lin has established an adverse employment action and a causal connection between that action and her protected activity. DOL Mem. at 14–20; Lin Resp. at 9–17.

### 1. Adverse Employment Action

To establish an adverse employment action for purposes of Title VII retaliation, a plaintiff must show that her employer engaged in action that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006). "Title VII's anti-discrimination and anti-retaliation provisions 'are not coterminous'; anti-retaliation protection is broader and 'extends beyond workplace-related or employment-related retaliatory acts and harm.'" Hicks, 593 F.3d at 165 (quoting White, 548 U.S. at 67). "'Context matters,' as some actions may take on more or less significance depending on the context." Tepperwien v. Energy Nuclear Operations, 663 F.3d 556, 568 (2d Cir. 2011) (quoting White, 548 U.S. at 69).

Lin points to three potentially adverse employment actions, but she focuses on DOL's decision in April 2013 not to hire her as an LSR in the Troy TCC. Lin Mem. at 5–8. She asserts that, even though she was reachable for the position and DOL was desperate for Chinese-speaking LSRs, she was "blacklisted during the interview process," allegedly because she had sued DOL after being fired from her previous job at the Troy TCC. Id. at 5. DOL does not

dispute that Lin became reachable for the LSR position in April 2013 or that Delehanty, who was responsible for hiring LSR candidates at the Troy TCC, chose not to hire Lin. DOL SMF ¶¶ 34–35.

There is something odd about a retaliatory failure-to-hire claim. See Velez v. Janssen Ortho, LLC, 467 F.3d 802, 803 (1st Cir. 2006) (describing retaliatory failure-to-hire cases as "unusual" and "rare"). Recall that Lin was terminated from her position at the Troy TCC in 2010, and that she later brought suit alleging, among other things, that the Troy TCC had been a hostile work environment. One would not expect someone like Lin to be eager to resume employment at a workplace that had been, at least from her perspective, "severely permeated with discriminatory intimidation, ridicule, and insult." Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002). In any case, a failure to hire is perhaps the paradigmatic example of an adverse employment action, and the Second Circuit has said as much in the retaliation context. See Sanderson v. N.Y.S. Elec. & Gas Corp., 560 F. App'x 88, 90 (2d Cir. 2014) ("In order to recover for a discrete act of . . . retaliation, such as a . . . failure to hire . . . , the plaintiff must demonstrate that the discrete act took place within the statutory time period."). One district court in this circuit has even concluded that "a reasonable worker might be dissuaded from engaging in protected activity if he knew that his *daughter-in-law* would not be hired in retaliation for his exercise of his rights under Title VII." Crawford v. Nat'l R.R. Passenger Corp., No. 15-CV-131, 2015 WL 8023680, at *11 (D. Conn. Dec. 4, 2015) (emphasis added). Since there is no dispute that Lin applied and was eligible for the LSR position at the Troy TCC, and that Delehanty refused to hire her, it seems clear that Lin suffered an adverse employment action.

DOL sees it differently. First, "the Civil Service Law ***does not*** require agencies to canvass eligible candidates or to conduct interviews." DOL Mem. at 15. Therefore, DOL's "failure to canvass and interview [Lin] for a Civil Service position" does not count as an adverse employment action. Id. DOL cites no cases to support this argument, and for good reason: it represents a fundamental misunderstanding of Title VII. A private employer, unlike DOL, is typically not bound by laws such as the New York Civil Service Law that set out elaborate processes for choosing whom to interview and hire. (Of course, the private employer must abide by antidiscrimination and other employment-related laws.) Indeed, the private employer need not interview or hire anybody. But if a candidate applies for a position, and the employer refuses to hire him because he is black, it has violated Title VII. See § 2000(e)-2(a) ("It shall be an unlawful employment practice for an employer to . . . refuse to hire . . . any individual . . . because of such individual's race . . . ."). Again, that is true even though the employer has no general obligation to consider any candidate. But DOL's argument would prevent this candidate from bringing suit, since the employer that turned him down was not *required* to consider anybody for the position. Lin faced a similar situation: she applied and was eligible for a position with the Troy TCC, and Delehanty, the man in charge of hiring for that position, saw her application and refused to hire her. DOL SMF ¶¶ 34–35. Even if the Civil Service Law did not obligate Delehanty to canvass or interview anybody for the position, DOL could still face liability under Title VII if the reason Delehanty refused to consider her was that she had previously brought a discrimination suit. Thus, the question whether DOL violated the Civil Service Laws in this case is a red herring.

12

Second, DOL argues that Lin's "failure to be hired for the LSR . . . position . . . did not constitute an adverse employment action because DOL did not end up hiring anyone for the position due to a funding shortage." DOL Mem. at 14. According to DOL, a retaliation claim cannot be "predicate[d] . . . on [a] failure to be hired for a position that was never filled." Id. at 15. Again, DOL does not cite a single case to support this proposition. This time, however, there is at least some authority for DOL's position, though none of it comes from the Second Circuit. The District Court for the District of Columbia has held that "there can be no finding of an adverse action [for purposes of retaliation] if there was no vacancy at the time plaintiff applied *or the position was never filled*." Morgan v. Fed. Home Loan Mortg. Corp., 172 F. Supp. 2d 98, 112–13 (D.D.C. 2001) (emphasis added), aff'd, 328 F.3d 647 (D.C. Cir. 2003). The Eleventh Circuit appears to have endorsed this view as well. See Terrell v. Paulding Cty., 539 F. App'x 929, 933 (11th Cir. 2013) ("Regarding the . . . position for which [the plaintiff] applied, it is undisputed that the County never filled this position. On this record, we agree with the district court's conclusion that [the plaintiff] did not suffer an adverse employment action.").

Terrell cited Morgan in concluding that the plaintiff did not experience an adverse employment action. Id. That is important, because Morgan was decided in 2001, before the Supreme Court ruled in White that an adverse employment action in the retaliation context is one that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." 548 U.S. at 57. Before White, the D.C. Circuit had required plaintiffs alleging unlawful retaliation to "show that they have suffered an adverse personnel action in order to establish a prima facie case." Brown v. Brody, 199 F.3d 446, 455 (D.C. Cir. 1999). White adopted a much broader approach to adverse employment actions, so that "[u]nlike the

discrimination provision of Title VII, which applies only to adverse actions affecting the terms and conditions of employment, the retaliation provision [now] applies to actions 'likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers.'" Vaughn v. City of New York, No. 06-CV-6547, 2010 WL 2076926, at *14 (E.D.N.Y. May 24, 2010) (quoting White, 548 U.S. at 68). Thus, White calls into question Morgan's continuing authority on this issue.

The ultimate question here is whether DOL's decision not to hire Lin for a position that was never actually filled would deter a reasonable worker from filing a discrimination charge. Lin points out that "at the time that [DOL] made the decision not to hire [Lin], DOL had adequate funding. The fact that they lost the funding at some later point . . . is irrelevant to their retaliatory actions." Lin Mem. at 10. DOL does not say how long the vacancy was open before it had to be cancelled, though it notes that "no one was hired to fill the position in 2013 or 2014." DOL SMF ¶ 41. Lin became reachable for the LSR position in April 2013. Id. ¶ 33. Further, as noted above, Xu was interviewed for the position toward the end of June. DOL Resp. to Lin SMF ¶ 30. At the very least, then, the vacancy was open for about two months.

The Court finds that a reasonable person would be discouraged from complaining about discrimination if she knew that her employer would respond by refusing to hire her for a position that, although ultimately never filled, remained open for at least two months. That kind of action does not create a merely "trivial harm[]," and it is far removed from the "petty slights, minor annoyances, and simple lack of good manners" that fail to establish a prima facie case of retaliation. White, 548 U.S. at 68. Lin lost out on the chance of getting a job, and the Court fails to see how the deterrent effect of that outcome is materially diminished by the fact that the

opening went away after a couple of months. Perhaps it makes more sense to think of a hiring

freeze as a legitimate, nonretaliatory reason for not hiring a plaintiff rather than as evidence of

the lack of an adverse employment action. See Bowers v. Shinseki, No. 08-CV-3445, 2009 WL

1257147, at *3 (S.D. Tex. May 6, 2009) ("Non-selection for a position that remains unfilled

cannot support a discrimination or retaliation claim because 'the cancellation of an opening is a

legitimate, non-discriminatory and non-retaliatory reason for not selecting [Plaintiff] for those

positions.'" (alteration in original) (quoting Phillips v. TXU Corp., 2006 WL 3900112, *5 (N.D.

Tex. Dec. 29, 2006))). In any case, Lin has shown that she experienced at least one adverse

employment action, which is sufficient to satisfy this prong of the prima facie case. See Beyer v.

County of Nassau, No. 02-CV-3310, 2006 WL 2729196, at *6 (E.D.N.Y. Sept. 25, 2006) ("[A]

Title VII plaintiff must demonstrate at least one adverse employment action . . . ."), rev'd on

other grounds, 524 F.3d 160 (2d Cir. 2008).

*2. Causation*

DOL argues that Lin has failed to establish the causation prong of the prima facie case.

DOL Mem. 18–20. "[A] plaintiff must plausibly plead a connection between the [adverse

employment] act[ion] and his engagement in protected activity." Vega v. Hempstead Union Free

Sch. Dist., 801 F.3d 72, 90 (2d Cir. 2015). "Unlike Title VII discrimination claims, however, for

an adverse retaliatory action to be 'because' a plaintiff made a charge, the plaintiff must plausibly

allege that the retaliation was a 'but-for' cause of the employer's adverse action." Id. (citing Univ

of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013)). "'[B]ut-for' causation does not

require proof that retaliation was the only cause of the employer's action, but only that the

adverse action would not have occurred in the absence of the retaliatory motive." <u>Zann Kwan v.</u>

<u>Andalex Grp.</u>, 737 F.3d 834, 846 (2d Cir. 2013).

Instead of addressing causation directly, the Court will proceed to the next two steps of

the Title VII retaliation analysis, namely whether DOL has offered a legitimate, nonretaliatory

reason for its action and whether Lin has shown that that reason is a pretext for retaliation. It is

well established that "a court may simply assume that a plaintiff has established a prima facie

case and skip to the final step in the [retaliation] analysis, as long as the employer has articulated

a legitimate, nondiscriminatory reason for the adverse employment action." <u>Howard v. MTA</u>

<u>Metro N. Commuter R.R.</u>, 866 F. Supp. 2d 196, 205 (S.D.N.Y. 2011) (collecting cases); <u>see also</u>

<u>Brady v. Office of Sergeant at Arms</u>, 520 F.3d 490, 494 (D.C. Cir. 2008) ("[T]he prima facie

case is a largely unnecessary sideshow. It has not benefited employees or employers; nor has it

simplified or expedited court proceedings. In fact, it has done exactly the opposite, spawning

enormous confusion and wasting litigant and judicial resources."); <u>Lapsley v. Columbia Univ.-</u>

<u>Coll. of Physicians & Surgeons</u>, 999 F. Supp. 506, 515 (S.D.N.Y. 1998) ("In considering a

summary judgment motion, courts should address the ultimate issue by examining whether the

plaintiff has presented sufficient evidence to permit a reasonable jury to conclude that a

defendant's decisions were motivated . . . by an impermissible reason."). This approach makes a

lot of sense in the retaliation context. The Second Circuit has held that causation may be shown

"by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the

employer's proffered legitimate, nonretaliatory reasons for its action." <u>Zann Kwan</u>, 737 F.3d at

846. The question whether Lin's protected activity caused DOL to take adverse action against her

is therefore practically indistinguishable from the question whether DOL's stated reasons for

taking that action were a pretext for retaliation. Thus, since Lin has established that she suffered

an adverse employment action, and DOL has offered a legitimate, nonretaliatory justification for

its conduct, "[r]ather than apply the . . . test formalistically, the Court will assume that [Lin] has

made out a prima facie case of [retaliation]." Morris v. Ales Grp. USA, Inc., No. 04-CV-8239,

2007 WL 1893729, at *7 (S.D.N.Y. June 29, 2007).

### 3. Legitimate, Nonretaliatory Reason and Pretext

DOL asserts that Delehanty, who had responsibility for hiring LSRs at the Troy TCC,

decided not to hire Lin for the open LSR position because she "had been unable to perform her

job as an SESC at the Troy TCC." DOL SMF ¶ 35. Neither party disputes that the SESC position

held by Lin is entry level, and that "[t]he LSR position, by comparison, is a higher level position

that entails more responsibility and requires a greater degree of knowledge." Id. ¶¶ 36–37; see

also Lin Resp. to DOL SMF ¶¶ 36–37. Delehanty says he "first learned in or around mid-2010

that [Lin] was struggling in her job as a[n] . . . SESC." Delehanty Decl. ¶ 5. In particular, he

discovered that she "was making an excessive amount of significant errors, exhibited poor

customer service skills, was difficult to work with, and generally had a poor attitude." Id. So in

April 2013, when Lin became reachable for the LSR position, Delehanty "determined, based on

his experience, that [Lin's] inability to perform her job as an SESC demonstrated that she would

be unable to perform the higher level functions of an LSR." DOL SMF ¶ 39.

Since DOL has "articulated a legitimate, non-discriminatory reason for its actions," Lin

must show that the reason offered is a pretext for retaliation. Martin v. State Univ. of N.Y., 704

F. Supp. 2d 202, 231 (E.D.N.Y. 2010). Lin "may succeed in this either directly, by persuading

the court that a [retaliatory] reason more likely motivated the employer, or indirectly, by showing

that the employer's proffered explanation is unworthy of credence." <u>Ponticelli v. Zurich Am. Ins.</u> <u>Grp.</u>, 16 F. Supp. 2d 414, 435 (S.D.N.Y. 1998). Lin may also rely on "evidence comprising the prima facie case" in showing pretext. <u>LaFond v. Gen. Physics Servs. Corp.</u>, 50 F.3d 165, 174 (2d Cir. 1995) (quoting <u>Chambers v. TRM Copy Ctrs. Corp.</u>, 43 F.3d 29, 38 (2d Cir. 1994)).

Lin argues that retaliatory animus is established by the March 2011 emails. Lin Mem. at 12. In the first email, Taylor, an assistant director of the Troy TCC, wrote:

> You probably know that one of our former employees, Hua Lin, filed a discrimination complaint against her former supervisor PESC Jackie Simmons. When the investigator was questioning us, at one point Hua told the investigator she had her production sheets. These production sheets contain SSNs and should not have been removed from the office. This is a breach of confidentiality. Can we use this to justify removing her from our LSR list?

Ex. E at 2. Lin suggests that this email shows Taylor trying to retaliate against her for complaining about discriminatory conduct at the Troy TCC. Lin Mem. at 13. Drawing all reasonable inferences in favor of Lin, <u>Reeves</u>, 530 U.S. at 150, the Court is inclined to agree. The natural reading of this email is that Taylor was looking for some justification for not hiring Lin that would serve as cover for Taylor's actual problem with her, which is that she had filed a discrimination complaint. Taylor started the email by pointing to Lin's protected activity. She then asked whether the alleged "breach of confidentiality" could be used to "justify removing her from our LSR list." Ex. E at 2. As the Court pointed out in its December Order, "the very fact that Taylor asked in the email for a 'legitimate, non-discriminatory reason' to 'justify' removing [Lin] from the LSR list suggests that she did not have one." Dec. Order at 10 (citations omitted). It beggars belief to say, as DOL does, DOL Mem. at 18–19, that this email provides no evidence of Taylor's retaliatory animus.

The problem for Lin is that it is not enough to show that Taylor wanted to retaliate against her for suing her employer. True, "the impermissible bias of a single individual at any stage of the promoting process may taint the ultimate employment decision in violation of Title VII." Bickerstaff v. Vassar Coll., 196 F.3d 435, 450 (2d Cir. 1999). And the Second Circuit has recently endorsed this theory of employer liability in the context of a retaliation claim. Vasquez v. Empress Ambulance Serv., Inc., 835 F.3d 267, 272 (2d Cir. 2016). But if, as is the case here, there is no evidence that the ultimate decision maker harbored retaliatory animus, the individual who does harbor such animus must have "played a meaningful role in the [hiring] process." Bickerstaff, 196 F.3d at 450. Accordingly, Lin must show not only that Taylor harbored retaliatory animus, but that she played a significant part in the process that led to the decision not to hire her. An examination of the cases fleshing out this rule shows that Lin cannot do so.

When courts in this circuit hold that someone other than the ultimate decision maker "taint[ed] the ultimate employment decision in violation of Title VII," id., there is typically some concrete evidence (or a plausible allegation) that the ultimate decision maker, in issuing the challenged employment decision, relied on statements made by the person harboring retaliatory or discriminatory animus, e.g., Vasquez, 835 F.3d at 269; Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 126 (2d Cir. 2004); Ferrell v. Leake & Watts Servs., Inc., 83 F. App'x 342, 346 (2d Cir. 2003); Jian Wang v. Int'l Bus. Machs. Corp., No. 11-CV-2992, 2014 WL 896721, at *1 (S.D.N.Y. Mar. 4, 2014); Kenchi v. Hanesbrands Inc., No. 10-CV-1662, 2011 WL 4343418, at *6 (S.D.N.Y. Aug. 12, 2011); McCowan v. HSBC Bank USA, N.A., 689 F. Supp. 2d 390, 411 (E.D.N.Y. 2010); Baron v. N.Y.C. Dep't of Educ., No. 06-CV-2816, 2009 WL 1938975, at *6 (E.D.N.Y. July 7, 2009); Penta v. Sears Roebuck, Co., No. 01-CV-2788,

2003 WL 21143071, at *6 (E.D.N.Y. May 12, 2003). And in cases where such evidence is lacking, there is usually some indication that the person harboring retaliatory animus had a "singular influence" or "dominated" the ultimate decision maker. Geras v. Hempstead Union Free Sch. Dist., 149 F. Supp. 3d 300, 328 (E.D.N.Y. 2015). In sum, the retaliatory animus "of intermediate supervisors who have input in the decisionmaking process will not give rise to liability if the supervisor with final authority bases an adverse employment action exclusively on an independent evaluation." McLean v. Metro. Jewish Geriatric Ctr., No. 11-CV-3065, 2013 WL 5744467, at *11 n.8 (E.D.N.Y. Oct. 23, 2013); accord Lampris v. Banco do Brasil, S.A., No. 10-CV-9576, 2012 WL 6021091, at *8 (S.D.N.Y. Dec. 4, 2012) ("[T]his is not a case in which the ultimate decision-maker had no ability independently to assess the plaintiff's performance or relied on the assessment of the plaintiff's direct supervisor who harbored discriminatory animus.").[1]

It is instructive to consider the facts of a few representative cases. In McGowan, there was evidence that the ultimate decision maker's subordinate harbored discriminatory animus toward the plaintiff, but the defendant claimed that liability could not attach because the ultimate decision maker lacked such animus. 689 F. Supp. 2d at 410. The court rejected the defendant's argument, noting that the ultimate decision maker "testified that he relied [on his subordinate's]

_____

[1] This approach is consistent with that adopted by Staub v. Proctor Hospital, 562 U.S. 411 (2011), which involved the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. § 4301 et seq., a statute "very similar to Title VII," id. at 417. There, the Supreme Court noted that the ultimate decision maker must have "relie[d] on facts provided by the biased supervisor" in order for the unlawful bias to be imputed to the employer. Id. at 421; see also Lobato v. N.M. Env't Dep't, 733 F.3d 1283, 1295 (10th Cir. 2013) (interpreting Staub to hold that "an employer is not liable under a subordinate bias theory if the employer did not rely on any facts from the biased subordinate in ultimately deciding to take an adverse employment action—even if the biased subordinate first alerted the employer to the plaintiff's misconduct").

evaluation of plaintiff in forming his own perceptions about plaintiff." Id. at 411. In Penta, the plaintiff's supervisor, who harbored discriminatory animus toward the plaintiff, provided the ultimate decision maker, who lacked such animus, with an arguably false account of a sale made by the plaintiff. 2003 WL 21143071, at *6. Because this supervisor's description of the sale "was . . . central to the decision to terminate [the] Plaintiff," the court found that "a finder of fact could conclude that [the] entire decision making process was . . . tainted." Id. Finally, in Kenchi, the plaintiff's supervisor, who had referred to the plaintiff using a racial slur, did not have ultimate decision-making authority. 2011 WL 4343418, at *6. But the court found that the supervisor played a meaningful role in the plaintiff's termination because "[a]n addendum to the plaintiff's performance improvement plan, signed by [the supervisor], state[d] that plaintiff" was being terminated because of "manager feedback" about his poor performance, and the supervisor was "the only manager identified in the plan." Id. at *5–6.

Unlike the cases just discussed, here Lin has not provided any evidence that Delehanty, who neither party disputes was the person responsible for the decision not to hire her, DOL SMF ¶¶ 34–35; Lin Resp. to DOL SMF ¶¶ 34–35, relied on Taylor's description of Lin's alleged misconduct in making the hiring decision. Instead, Lin, citing only the March 2011 emails, asserts that Taylor "interjected herself into th[e decision-making] process with a series of emails, asking decision-makers to remove [Lin] from the Civil Service List." Lin Resp. to DOL SMF ¶ 53. She also notes that Taylor "admitted that she 'warned' people 'not to hire Hua Lin,'" id. (quoting Dkt. No. 39-12 ("Exhibit K") at 137), though she does not mention that these "people" did not include Delehanty, Ex. K at 136:16–137:7. This evidence would not permit a reasonable juror to conclude that Delehanty "simply rubberstamped" Taylor's conduct. Jones v. City of New

York, No. 14-CV-826, 2015 WL 502227, at *4 n.6 (E.D.N.Y. Feb. 5, 2015) (quoting Gomez v. City of New York, No. 12-CV-6409, 2014 WL 4058700, at *5 (S.D.N.Y. Aug. 14, 2014)).

It is true that Delehanty was part of the March 2011 email chain, but he never responded to those emails, and again there is no indication that when deciding not to hire Lin in April 2013—over two years after the emails were sent—Delehanty took into consideration Taylor's comments about Lin's alleged misconduct. Moreover, Delehanty says that in mid-2010, he first learned of Lin's "poor performance" as an SESC, Delehanty Decl. ¶ 5, and Lin does not dispute this. By the time Taylor sent her emails, then, Delehanty had known for several months that Lin could not adequately fulfill the duties of an entry-level position at the Troy TCC. Thus, "this is not a case in which the ultimate decision-maker had no ability independently to assess the plaintiff's performance or relied on the assessment of the plaintiff's [superior] who harbored discriminatory animus." Lampris, 2012 WL 6021091, at *8. Further, Lin fails to provide any evidence linking any of the individuals involved in the March 2011 emails to the other allegedly adverse employment actions of which she complains—her unsolicited removal from the civil service list and the failure to canvass her for the Endicott LSR position. Lin SMF ¶¶ 34–42.

But Lin does not rely solely on the March 2011 emails to show pretext. She also points to DOL's decision to continually reappoint Tang as a provisional LSR despite his inability to pass the relevant Civil Service Exam. Lin Mem. at 7. Further, Lin notes that DOL interviewed Xu twice for the LSR position even though it was clear after his first interview that his English was quite poor. Id. at 8. As Lin puts it, DOL "had reason to question whether both Mr. Xu and Ms. Lin would be successful employees, yet only Ms. Lin was rejected before the interview stage. . . . The only difference between the two was the fact that Ms. Lin had previously engaged

in protected activity, and Mr. Xu had not." Lin Resp. at 17. A similar point presumably applies to Tang, and Lin suggests it creates a question of fact as to whether DOL was motivated by retaliatory animus in refusing to hire her. Id.

These facts do not create the inference Lin wants them to. As the Court has pointed out several times already, Lin had a documented record of poor performance at an entry-level position at the Troy TCC. As an SESC, she "was making an excessive amount of significant errors, exhibited poor customer service skills, was difficult to work with, and generally had a poor attitude." Delehanty Decl. ¶ 5. DOL therefore had every reason to believe Lin would not be a good LSR, a position that neither party disputes requires greater skill and expertise than an SESC. By contrast, Xu had never worked at the Troy TCC. DOL ended up not hiring him, but the decision to interview him twice despite his poor showing at the first interview does not reflect a lack of concern about qualifications. Instead, it reflects the fact that unlike Lin, Xu had never had a chance to prove his inability to perform entry-level work at the Troy TCC. The same is true for Tang. He turned out to be unable to pass the test, but that does not mean he was similarly situated to Lin in his ability to perform the work of an LSR. Neither party disputes that Tang had worked as a provisional LSR at the Troy TCC for at least a couple of years. Lin SMF ¶¶ 26–27; Delehanty Decl. ¶ 12. Lin has failed to put forth any evidence suggesting that Tang's performance at the Troy TCC was unsatisfactory or that, as was the case with Lin, he was unable to perform basic aspects of his job. Accordingly, Lin's comparison of her situation to Xu's and Tang's does not create a genuine issue of fact as to whether DOL's stated reason for not hiring her is a pretext for retaliation.

Lin also attempts to show pretext by pointing to DOL's allegedly inconsistent explanations for the decision not to hire her. Lin Mem. at 12–15. Lin notes that when moving to dismiss the Complaint, DOL argued that in her first March 2011 email, Taylor was just asking "whether there was a legitimate reason to remove [Lin] from the list, and that the statement that they needed to get 'past' her on the list was actually a statement that they needed to get past their negative feelings about her." Id. at 12. But in its reply to Lin's EEOC complaint, DOL said that it could not hire Lin because she "did not receive a sufficiently high score on the civil service examination at issue to be eligible . . . in a geographic location that she selected." Ex. Q at 4. And now DOL is arguing that Lin was not hired because she had shown herself to be incompetent at her previous job with the Troy TCC. DOL Mem. at 21. According to Lin, these allegedly inconsistent explanations call into question DOL's nonretaliatory justification for refusing to hire her.

A plaintiff may show pretext by pointing to "implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." Zann Kwan, 737 F.3d at 846. But "in order to infer pretext for a retaliatory motive from multiple justifications, a defendant's nonre[t]aliatory justifications must be not merely different, but inconsistent with one another." Richardson v. Bronx Lebanon Hosp., No. 11-CV-9095, 2014 WL 4386731, at *16 (S.D.N.Y. Sept. 5, 2014) (collecting cases); see also Irons v. Bedford Stuyvesant Cmty. Legal Servs., No. 13-CV-4467, 2015 WL 5692860, at *30 (E.D.N.Y. Sept. 28, 2015) ("As these varied explanations for Plaintiffs' selection for termination are not *contradictory*, this . . . fails to raise a question of fact as to whether Defendants would not have terminated Plaintiffs but for their retaliatory motives." (emphasis added)). As discussed above, under

Nassar, "Title VII retaliation claims must be proved according to traditional principles of but-for causation." 133 S. Ct. at 2533.

Lin cannot use these differing explanations to create a genuine issue of fact as to retaliatory motive because they are "merely different," not contradictory. Richardson, 2014 WL 4386731, at *16. First, DOL's current position on the meaning of Taylor's emails is actually not different from its position at the motion-to-dismiss stage. When moving to dismiss the Complaint, DOL argued that the emails showed Taylor searching for a legitimate, nonretaliatory reason for not hiring Lin. Mem. at 4–5. Now DOL says Taylor was "rightfully concerned about [Lin's alleged misconduct] because it constituted a breach of . . . confidentiality that could result in discipline." DOL Mem. at 19. Lin's alleged misconduct is precisely the legitimate, nonretaliatory reason DOL was pointing to when moving to dismiss. Moreover, it is not inconsistent with any of this for DOL, in moving for summary judgment, to also assert that Lin's incompetence caused Delehanty to refuse to hire her. DOL is saying that the emails do not demonstrate retaliatory animus, and that with retaliation out of the picture, Lin's poor performance as an SESC provides the true explanation for its conduct toward her. There is thus no meaningful disconnect between DOL's position at the motion-to-dismiss stage and now.

Second, there is no contradiction between DOL's position in its letter to the EEOC and its current position. In its EEOC response, DOL said Lin was not hired because she had not scored high enough on the Civil Service Exam to be eligible for a position in an area for which she indicated a preference. Ex. Q at 4. This explanation is true but incomplete. Lin did become reachable in April 2013, DOL SMF ¶¶ 32–33, but until that time she could not be hired by DOL. Thus, while the EEOC response does not represent the full story, it does not contradict DOL's

assertion that Lin was not hired because of her poor performance. Until she became reachable in April 2013, her poor performance was simply irrelevant, since she could not be hired in any event, as the EEOC response correctly points out. But once she became reachable, the question of her performance became important, because an inability to do the work associated with an entry-level position strongly suggests an inability to perform work requiring much greater levels of skill and expertise. "Neither <u>Nassar</u> nor <u>Kwan</u> requires complete identity of details in each explanation; they simply require that the explanations cohere." <u>Richardson</u>, 2014 WL 4386731, at *17. The explanations offered by DOL focus on different aspects of Lin's attempts to obtain employment at the Troy TCC, but they form a coherent picture and they certainly do not contradict one another.[2]

Lin has failed to create a genuine issue of fact as to whether DOL's legitimate, nonretaliatory explanation for its decision not to hire her—her poor performance as an SESC—is a pretext for a desire to retaliate against her for engaging in protected activity. She has also failed to provide evidence suggesting that retaliatory animus was the but-for cause of DOL's treatment

---

[2] <u>Zann Kwan</u> provides a useful example of explanations that are clearly inconsistent enough to undermine a defendant's legitimate, nonretaliatory explanation. There, the defendant "claimed throughout its Position Statement to the EEOC that [the plaintiff] and [another employee] were both terminated largely because of [the defendant's] change in business focus from domestic real estate to international gaming and hospitality." <u>Zann Kwan</u>, 737 F.3d at 846. Yet the defendant's CEO, who also happened to be the plaintiff's supervisor, "later testified that [the plaintiff], unlike [the other employee], was *not* terminated because of a shift in company focus." <u>Id.</u> (emphasis added); <u>accord</u> <u>Benussi v. UBS Fin. Servs. Inc.</u>, No. 12-CV-1261, 2014 WL 558984, at *11 (S.D.N.Y. Feb. 13, 2014) (finding an inconsistency sufficient to show pretext where the defendant's "HR representative . . . denied at her deposition that [the plaintiff] was terminated for refusing to name the person who made [an] offensive comment, although [the defendant] cited this as a reason in its EEOC statement (before the deposition) and in its present briefs (after the deposition)"). This stark discrepancy in explanations is a far cry from the differing yet consistent rationales offered by DOL in this case.

of her. Accordingly, Lin's motion for summary judgment is denied, and DOL's cross-motion for summary judgment is granted.[3]

## V.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that DOL's Cross-Motion for Summary Judgment (Dkt. No. 45) is **GRANTED**; and it is further

**ORDERED**, that Lin's Motion for Summary Judgment (Dkt. No. 39) is **DENIED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:     February 01, 2017
           Albany, New York

Lawrence E. Kahn
U.S. District Judge

---

[3] DOL argues that collateral estoppel bars Lin from bringing this case. DOL Mem. at 12–14. But since the Court concludes that summary judgment in favor of DOL is warranted on the merits of Lin's Title VII claim, it need not reach the collateral estoppel argument.